**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-20-00096-CR**
**NO. 09-20-00097-CR**
**NO. 09-20-00098-CR**
_____

**ANTHONY HARBOUR, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

_____

**On Appeal from the 75th District Court**
**Liberty County, Texas**
**Trial Cause Nos. CR33946, CR33947, CR33948**
_____

**MEMORANDUM OPINION**

A jury convicted appellant Anthony Harbour of three charges of aggravated robbery and assessed punishment at thirty-six years of confinement in each case, with the sentences to run concurrently. In two issues, Harbour challenges the legal sufficiency of the evidence and asserts that the trial court abused its discretion by allowing the State to present evidence of extraneous offenses during the punishment phase. We affirm the trial court's judgment.

1

THE EVIDENCE

Emma Broussard testified that she resides on a county road in Dayton, Texas, and she was in a travel trailer on the property because her home was being built by Joe.[1] Broussard explained that on the date in question, her dogs began to bark and growl, and she saw "the suspect running, getting out of the car and running around to the millworker." According to Broussard, the suspect was pointing a gun at one of the millworkers, David, and yelling at David to give him an envelope. Broussard testified that Joe was also present, and she saw the suspect point a gun at Joe. Broussard explained that she called 911 and tried to describe what was happening. Broussard testified that she saw David give the envelope to the suspect. According to Broussard, the man with the gun was wearing dark denim pants, a plaid shirt, a handkerchief on his face, sunglasses, and a cap, and she estimated that he was approximately five feet seven inches tall and appeared to be stocky.

David testified that he was doing some carpentry work for Joe at a residence in the Kenefick area on April 23, 2018. David explained that he had gone to the bank to cash a check before going to the job site. David testified that the check was for $7000, and he deposited $5000 and asked for $2000 in cash. According to David,

---

[1]To protect the privacy of the victims, we refer to them using the fictitious names Joe, John, and David. *See* Tex. Const. art. I, § 30 (granting crime victims "the right to be treated with fairness and respect for the victim's dignity and privacy throughout the criminal justice process").

the bank gave him $2000 in $100 bills in a white envelope. David explained that one of his workers, John, was with him when he went to the bank. According to David, when he got out of his van at the job site, he felt something hit his head, and when he turned around, he realized that someone was holding a gun on his forehead and yelling at David to give him the white envelope.

When asked what he recalled about the gunman, David testified that the gunman's "mouth was covered from the nose down, and he was a colored person." David explained that he felt threatened, and his coworkers told him his face and lips turned white. David testified that he gave the envelope, which contained $2000 in cash, and his cellphone to the gunman. According to David, the gunman also pointed the weapon at John and Joe, and John gave the gunman his wallet. David explained that after the robbery, he and the other victims found his cellphone and John's wallet between the house and where the police stopped the suspects' vehicle approximately four blocks away. David testified that Joe called 911.

John testified that he accompanied David to the bank to deposit a check and get cash, and he saw that David had the money in an envelope. According to John, when he and David reached the job site, a car entered with them, and someone got out of the car and "went straight to [David]." John testified that the person had a black and purple gun in his hand and was pointing the gun at David, and the gunman forced David to get the envelope from the van. John explained that he gave the

3

gunman his wallet, which contained over $400, because he saw the gunman pointing a gun at both David and John. According to John, the gunman was wearing gloves and had a handkerchief on his face. John explained that the gunman got into the passenger side of the car after the robbery, and the driver did not get out of the vehicle. John testified that he saw the numbers "4623" on the car's license plate.

Joe testified that on April 23, 2018, he was working as the contractor building a home for Broussard and her husband. According to Joe, he saw David's van enter the jobsite, and someone jumped next to the door with a gun. Joe explained that the gunman was African-American, and he knew that no African-American subcontractors were working at the site. Joe testified that he heard the gunman saying "Give me the money. Give me the money." According to Joe, the robber was pointing a gun at David, and David gave the robber his wallet. Joe then offered the robber money from his own wallet. Joe testified that the robber instructed him to put his hands up and continued to ask for money. According to Joe, the robber asked David for the white envelope.

Joe explained that the robber had both David and John kneeling on the ground, and the robber was pointing a gun at David's forehead. According to Joe, the robber began counting down, and Joe told David to give the robber the envelope because they might get shot. Joe testified that he was "frightened to death." Joe explained that when the robber got the envelope, the robber jumped into the passenger side of

4

the car, and the car "immediately took off." Joe then called 911, and when he went to the scene of the traffic stop, he identified the car as the one that had been on the Broussards' property.

Mayela Pruneda testified that on April 23, 2018, she reported to the Houston Police Department that a black and purple firearm had been stolen from the trunk of her car. Pruneda testified that she knows Harbour, but she did not give the firearm to Harbour.

Deputy John Tucker of the Liberty County Sheriff's Office testified that on April 23, 2018, he responded to a call about an aggravated robbery. Based upon the information in the 911 call, Tucker located a blue Kia, which he believed to be the suspect's vehicle. As Tucker approached the vehicle, it came to an abrupt stop, and Tucker explained that he almost struck the vehicle. Tucker testified that he initiated a felony takedown, and the driver got out of the vehicle as soon as the driver saw Tucker getting out. A second suspect remained in the vehicle, and Tucker informed dispatch of his location and waited for backup. The driver remained on the ground, and Tucker instructed the passenger to keep his hands on the dashboard. Tucker explained that he was the first law enforcement officer to encounter the occupants of the vehicle. Tucker identified Harbour in court as the passenger. According to Tucker, the license plate of the vehicle was HDV4623.

Tucker instructed Harbour to get out of the vehicle, and he arrested Harbour and the driver. Tucker and other officers searched the vehicle and took photographs, and the photographs of the vehicle and its contents were admitted into evidence. Investigating officers found gloves, beanies, and cell phones inside the vehicle. Tucker explained that his vehicle is equipped with a video system that recorded the traffic stop, and a copy of the recording was admitted into evidence. Tucker testified that all the evidence from the scene was brought to him for processing. According to Tucker, officers knew a weapon was involved in the offense, so their "first priority was to try to locate that weapon[.]" Tucker testified that he was unable to locate the firearm. The victims came to the scene of the traffic stop, but Tucker explained that he could not communicate with them due to a language barrier.

Sergeant Paul Young testified that he responded to an aggravated robbery call on the date in question, and his car was equipped with a video camera that recorded his response to the call. A copy of the video was admitted into evidence. Young explained that he eventually left the scene to check the immediate area for weapons, and he testified that constables in the area found a weapon approximately fifty feet from where the stop was made. Photographs of the firearm and its approximate location when it was found were admitted into evidence. The photographs show that the firearm the constables recovered was black and purple. According to Young, the

6

weapon was loaded and ready to fire, and there were skid marks on the weapon "as if [it had] been thrown."

Patrol deputy George Daniels of the Liberty County Sheriff's Office testified that he was dispatched to the Kenefick area on April 23, 2018, and he went to the scene of the traffic stop by Tucker. After ensuring that Tucker had the scene under control and discussing the case with Tucker, Daniels "went to the county road where the alleged crime started[]" and photographed the scene. Daniels explained that the scene was quite muddy, and he photographed footprints and tire tracks. Daniels then returned to the scene of the traffic stop and examined Harbour's shoes, and he explained that Harbour's shoes were muddy and looked "[v]ery similar to the photographs[.]" Daniels testified that he also examined the driver's shoes, and the driver's shoes were not muddy and did not match the footprint photographs from the scene. Daniels explained that he had examined the bottom of the shoes of everyone else who was at the crime scene, and he determined that none of those shoes could have made the footprints.

## ISSUE TWO

In issue two, Harbour challenges the sufficiency of the evidence supporting his convictions. If sustained, issue two would result in rendition of a judgment of acquittal; therefore, we address it first. *See Price v. State*, 502 S.W.3d 278, 281 (Tex. App.—Houston [14th Dist.] 2016, no pet.); *see also* Tex. R. App. P. 47.1. In

7

evaluating the legal sufficiency of the evidence, we review all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the essential elements of the offense beyond a reasonable doubt. *Brooks v. State*, 323 S.W.3d 893, 902 n.19 (Tex. Crim. App. 2010) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). The jury is the ultimate authority on the credibility of witnesses and the weight to be given to their testimony. *Penagraph v. State*, 623 S.W.2d 341, 343 (Tex. Crim. App. [Panel Op.] 1981). A reviewing court must give full deference to the jury's responsibility to fairly resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Hooper*, 214 S.W.3d at 13. If the record contains conflicting inferences, we must presume that the jury resolved such facts in favor of the verdict and defer to that resolution. *Brooks*, 323 S.W.3d at 899 n.13; *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). In addition, we determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict. *Clayton*, 235 S.W.3d at 778.

Section 29.03 of the Texas Penal Code provides, in pertinent part, that a person commits the first-degree felony offense of aggravated robbery if he commits robbery as defined in section 29.02 and uses or exhibits a deadly weapon. Tex. Penal Code Ann. § 29.03(a)(2), (b). Section 29.02 of the Texas Penal Code provides that

8

a person commits the offense of robbery if, while committing theft, and with intent to obtain control of the property, he intentionally or knowingly threatens or places another in fear of imminent bodily injury or death. *Id*. § 29.02(a)(2).

Viewing the evidence in the light most favorable to the verdict and deferring to the jury's authority regarding the credibility of witnesses and the weight to give their testimony, we conclude that a reasonable factfinder could have found, beyond a reasonable doubt, that Harbour was guilty of the aggravated robberies of John, David, and Joe. *See* Tex. Penal Code Ann. § 29.03; *Brooks*, 323 S.W.3d at 902 n.19; *Clayton*, 235 S.W.3d at 778; *Hooper*, 214 S.W.3d at 13; *Penagraph*, 623 S.W.2d at 343. Accordingly, the evidence was legally sufficient, and we overrule issue two.

ISSUE ONE

In issue one, Harbour asserts that the trial court abused its discretion by allowing the State to present evidence of extraneous offenses during the punishment phase. Harbour contends that the State failed to prove beyond a reasonable doubt that he committed the alleged extraneous offenses, and he argues that the harmful consequences of admitting the extraneous offense evidence outweighed its probative value under Rule 403 of the Texas Rules of Evidence. Harbour also asserts that the trial court's admission of the extraneous offense evidence was not harmless.

The record shows that at the beginning of the punishment phase, the State offered into evidence exhibits 102 through 111, all of which constituted

documentary evidence of Harbour's previous felony offenses, including unauthorized use of a vehicle, felon in possession of a weapon, and aggravated robbery with a deadly weapon. The proffered exhibits also pertained to Harbour's juvenile offenses. When the State offered the exhibits into evidence, the trial judge told defense counsel that he was not required to stipulate as to authenticity, authentication, or identity. Defense counsel stated, "I have no objection, Judge." The trial judge then asked defense counsel, "[D]oes your client stipulate that he is in fact one and the same person as identified in each of those judgments?" Defense counsel responded, "Yes, sir[,]" and the trial judge admitted the exhibits into evidence.

Tim[2] testified that on July 8, 2006, he was robbed by a juvenile at gunpoint. According to Tim, the juvenile demanded that Tim give him his wallet, and Tim complied. Tim explained that he was unable to identify the robber, but the robber was caught and prosecuted. The prosecutor stated, "You seem almost emotional. Am I misreading that?" Tim responded, "No, you're not." Tim testified, "I don't want him to hurt anybody, especially if he's pointing guns at people[,] . . . [b]ut I'm also not excited about the prospect of helping put somebody in jail for a long time." The prosecutor stated, "You're just here to talk about what happened to you. Do you understand that?" In addition, the prosecutor told Tim that he did not intend to ask

---

[2]We identify the victim of Harbour's juvenile offense by using a fictitious name.

Tim for a recommendation about Harbour, and he instructed Tim that the decision "is up to the jury about what to do with Mr. Harbour." Tim also testified that he was notified after the robbery that the weapon Harbour displayed was a BB gun. Defense counsel did not object to any of Tim's testimony. The trial court's punishment charge to the jury included the following instruction:

> You are further instructed that if there is any evidence before you in this case regarding the Defendant's committing an alleged offense or bad acts other than the offense alleged against him in the indictment in this case, you cannot consider such evidence for any purpose unless you find and believe beyond a reasonable doubt that the Defendant committed such other offense or bad acts and even then you may only consider the same in determining the proper punishment for the Defendant in this case.

To preserve a complaint for appellate review, the record must demonstrate that the appellant made his particular complaint known to the trial court by a timely request, objection, or motion, and that the trial court ruled on the request, objection, or motion. Tex. R. App. P. 33.1(a); *Ross v. State*, 678 S.W.2d 491, 493 (Tex. Crim. App. 1984). The record reflects that Harbour did not file any motions, and defense counsel did not object to the admission of the documentary evidence regarding Harbour's prior offenses or to any of Tim's testimony. We conclude that Harbour failed to preserve issue one for appellate review. *See* Tex. R. App. P. 33.1(a); *Ross*, 678 S.W.2d at 493. Accordingly, we overrule issue one. Having overruled both of Harbour's issues, we affirm the trial court's judgment of conviction in each case.

11

AFFIRMED.

                    _____
                          W. SCOTT GOLEMON
                                Chief Justice

Submitted on April 12, 2021
Opinion Delivered May 26, 2021
Do Not Publish

Before Golemon, C.J., Kreger and Horton, JJ.